On Rehearing ex Mero Motu
This court's opinion dated August 24, 2001, is withdrawn, and the following opinion is substituted therefor.
Brian Kevin Pankey ("the father") appeals from a judgment divorcing him from Mary Sue Pankey ("the mother"). He argues that the trial court erred in awarding the mother primary physical custody of the parties' minor child and in dividing the personal property of the parties. The mother did not file a brief on appeal; however, the mother filed a letter brief with the court after this court issued its August 24, 2001, opinion. Unfortunately, the mother's failure to file a brief in this court at the time of the original submission of the appeal precludes her from filing, as a matter of right, an application for rehearing. Rule 40(a)(2), Ala.R.App.P. However, this court may put a case on rehearing ex mero motu.
Where a trial court makes a custody determination following an ore tenus proceeding, its judgment will not be reversed absent a showing that the judgment is so unsupported by the evidence as to be plainly and palpably wrong. Ex parte Jones, 620 So.2d 4 (Ala. 1992); Pickett v.Pickett, 792 So.2d 1124 (Ala.Civ.App. 2001). The trial court is in the best position to determine custody, because it is able to evaluate the evidence and the credibility of *Page 960 
the witnesses. Hall v. Hall, 571 So.2d 1176 (Ala.Civ.App. 1990). Our review is limited; this court is not allowed to substitute its judgment for that of the trial court in cases involving child custody and visitation. Ex parte R.T.S., 771 So.2d 475 (Ala. 2000); Ex parte D.W.W.,717 So.2d 793 (Ala. 1998); Ex parte Patronas, 693 So.2d 473 (Ala. 1997).
Following ore tenus proceedings, the trial court entered an order, stating:
 "3. Each party is awarded the personal property in their possession.
 "4. There was no real property owned by the parties to divide.
 "5. Each party shall be responsible for payment of their own individual debts and [the father] shall pay the remaining debt on the credit cards used by the parties during the marriage.
 "6. There was one child born as a result of this marriage. . . . The parties are awarded joint legal custody of said child. The [mother] shall have primary physical custody of said child ten (10) months out of the year and [the father] shall have primary custody of said child two (2) months during the summer (June and July). Each party shall have reasonable visitation . . . during the period of time they do not have primary physical custody. Provided further, that should [the father] be required to conduct field training exercises for a period that exceeds two (2) days in duration, [the mother] shall have the physical custody of the child during such times. The Court reminds the parties that the Standard Visitation Order provides for additional visitation as mutually agreed between the parties and the Court encourages the fostering of frequent visitation for the good of the child.
 "7. The [father] shall pay to the [mother] the sum of $412.96 per month (year round) for the support and maintenance of the minor child payable on the first day of each month beginning July 1, 2000 and on the first day of each month thereafter. Said payments shall be made to the office of the Circuit Clerk for Marshall County, Alabama. Said support has been calculated in accordance with Rule 32,[Ala. R. Jud. Admin.]and is compliance therewith. An Income Withholding Order shall be made a part of this Judgment but shall not be served upon [the father]'s employer unless he becomes in arrears in the amount of one month support."
Each party filed a postjudgment motion. The trial court amended its order to restore the mother's use of her maiden name, to clarify that the father would not have to pay child support while he was the child's primary custodian, and to require that the mother assist with transportation so as to enable the husband to exercise his visitation. All other postjudgment relief was denied.
The record reveals that when the parties married in August 1995, the mother was pregnant; she was 18 and the father was 24. The mother had recently completed high school and the father had graduated from college and was in the military service. Within a month of their marriage, the parties moved to Fort Drum, New York, where their child was born in February 1996. The father was required to perform duty outside of New York for weeks or a month at a time. Shortly after giving birth, the mother overdosed on acetaminophen and was transported to the hospital, where her stomach was pumped. She was diagnosed with postpartum depression and was prescribed Prozac, an antidepressant. The mother told the father after a year of marriage that she wanted a divorce. *Page 961 
The father testified that in July 1997, while the parties were in New York, the mother began going out with female friends. He stated that at first she would go out once every two weeks. However, she later began to go out once a week until the parties moved in December 1997. On five or six occasions, the mother went out at 10:00 p.m. and stayed out until 5:00 a.m., without telling the father where she was. The mother stated that often she was not sure where she and her friends were going to go, but that she had left the child with the father, and the child was sleeping through the night. The mother admitted that she had tried marijuana "a couple of times." She testified that on one occasion, she and the father had gone with friends to an automobile race. When the father left to buy beer, the mother tried cocaine given to her by one of their friends who was also attending the race.
The parties lived in New York for two years; the father was then transferred to Korea. The mother testified that she and the father discussed whether it would be best for her and the child to stay in the United States. She stated that she and the child "could not go to Korea." The father had to attend school in Alabama before leaving for Korea, and the mother moved back to Alabama with the child. The mother told the father before he left for Korea that she wanted a divorce. The father visited Alabama during the middle of his tour in Korea, and, at his suggestion, the mother went to see a physician and was again prescribed Prozac. The mother stated that she was under a lot of stress while the father was in Korea, and she was taking care of the child and attending business school. She testified that during the father's tour in Korea, she went to New Orleans and Dothan while the child stayed with her mother.
The mother testified that she had had three extramarital affairs of short duration while the father was in Korea. She admitted that the father did not know about these affairs until she disclosed them during her deposition. The father testified that in January 1999 the mother told him that she wanted a divorce. He stated that he wanted to "work it out," but that the mother "didn't like that idea." In March 1999, while the father was still in Korea, the mother told the father that she and the child had moved in with her boyfriend, S.P.
The father moved back to the United States in May 1999. He had a three-week break before reporting for his next tour of duty, and the child stayed with him during the break. The father was stationed in Kentucky from June 1999 to March 2000. The mother sued for a divorce on June 4, 1999. In July 1999, the father stopped sending money to the mother for the child. In March 2000, the father was transferred to Enterprise, Alabama. The father has continued to see the child on weekends when he was not in training.
The father testified that he is training to be a pilot in the Army and that three days a week, he is at work from 5:30 a.m. to 5:00 p.m. On Tuesday and Thursday, he works from 7:30 a.m. to 5:00 p.m. He stated he lives near a day-care facility and that he plans to leave the child at the facility while he is at work. He stated that he had training exercises that lasted up to four weeks and that during those times, the child could stay with a member of the father's family, none of whom live in the immediate area. He testified that after a year in Enterprise, the next transfer he will receive will be for three years.
The mother testified that the child calls both the father and her boyfriend "Daddy." She stated that the boyfriend had showered with the child on occasion. She *Page 962 
stated that the child is close to the boyfriend and that the boyfriend has helped support the child financially. She also stated that she and the boyfriend now have a child together. The mother testified that the child is very close to his half-sibling.
The father argues that the trial court erred in awarding primary physical custody to the mother, based on her adulterous conduct and the indiscretions. Nothing in the record indicates that the mother's past behavior has detrimentally affected the child. Although the father failed to provide support for the child for a period, it is clear that he is a capable parent. It is clear from the record that both parties love the child. It is also clear that the mother is capable of fulfilling her obligations as a parent. The father even admits that the mother is a good mother. To be sufficient to deprive a parent of custody, acts of indiscretion or adultery must be such as to have a direct bearing upon the welfare of the child. Hearold v. Hearold, 620 So.2d 48 (Ala.Civ.App. 1993). There is no evidence in the record of a detrimental effect on the child. Therefore, we cannot say that the trial court abused its discretion in awarding primary physical custody to the mother.
The father also argues that the trial court erred in making him wholly responsible for the parties' credit-card debt. A trial court's property division will not be reversed absent a showing of plain and palpable error. Montgomery v. Montgomery, 519 So.2d 525 (Ala.Civ.App. 1987). A division of marital property is not required to be equal, but it must be equitable, according to the particular facts and circumstances presented in the case. Golden v. Golden, 681 So.2d 605 (Ala.Civ.App. 1996); Parrishv. Parrish, 617 So.2d 1036 (Ala.Civ.App. 1993).
 "When dividing marital property, a trial court should consider several factors, including the length of the marriage; the age and health of the parties; the future prospects of the parties; the source, type, and value of the property; the standard of living to which the parties have become accustomed during the marriage; and the fault of the parties contributing to the breakup of the marriage."
Golden, 681 So.2d at 608 (citing Hartzell v. Hartzell, 623 So.2d 323
(Ala.Civ.App. 1993)).
The marriage lasted nearly four years, and both parties are young and in good health. The credit card at issue was in the father's name when the couple married, and at that time it had a balance of approximately $12,000, which was solely from the father's use. When the parties were divorced, the balance was approximately $20,000. The father has established a career in the Army, while the mother works part-time as a waitress on weekends. The father reported earnings of $2,906 per month; the mother reported earnings of $350 per month. Although the mother's extramarital affairs contributed to the breakdown of the marriage, the trial court did not err in its division of the marital assets.
ON REHEARING EX MERO MOTU: OPINION OF AUGUST 24, 2001, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
Yates, P.J., and Crawley, J., concur.
Pittman and Murdock, JJ., concur in the result.
Thompson, J., dissents. *Page 963