848 So.2d 963 (2002)
Ex parte Brian Kevin PANKEY.
(In re Brian Kevin Pankey v. Mary Sue Pankey.)
1011274.
Supreme Court of Alabama.
October 18, 2002.
Christopher A. Pankey, Albertville, for petitioner.
Submitted on petitioner's brief only.
WOODALL, Justice.
The petition for the writ of certiorari is denied.
In denying the petition for the writ of certiorari, this Court does not wish to be understood as approving all the language, reasons, or statements of law in the Court of Civil Appeals' opinion. Horsley v. Horsley, 291 Ala. 782, 280 So.2d 155 (1973).
WRIT DENIED.
HOUSTON, JOHNSTONE, and STUART, JJ., concur.
LYONS and HARWOOD, JJ., concur specially.
MOORE, C.J., and BROWN, J., dissent.
LYONS, Justice (concurring specially).
My vote to deny the petition for the writ of certiorari should not be construed as supportive of a casually dismissive attitude concerning the potentially harmful effects of the adulterous activity of a parent upon a child. However, under the circumstances of this case, I defer to the trial court's judgment in which it awarded primary custody of the six-year-old boy to his mother.
The trial court had the opportunity to observe the demeanor of the witnesses as they testified at trial; to assess the credibility both of the mother in her plea for continued custody and of the father, who acknowledged that the mother is a good mother; to weigh the effect upon the youngster of being placed in day careas he would if the father had been awarded custodyfor an average of more than 10 hours per day, 5 days per week, and on 3 of those days early enough to allow the father to be on duty at 5:30 a.m.; to weigh the effect of relocating the boy so he could be with the father's family during the father's training activities, which are as long as four weeks; and to consider all other factors in the record.
The trial court obviously concluded that the child's best interests at this stage in his life were best served by allowing the mother to retain custody. I cannot second-guess this judgment based upon the materials before us. We should not make the mother pay a very dear price for her misconduct at the expense of this six-year-old boy.
HARWOOD, Justice (concurring specially).
I write specially in light of the lengthy dissent by the Chief Justice. He raises many valid and challenging legal, social, and moral points, but I respectfully disagree that we properly can address those points in response to the petition for the writ of certiorari filed by Brian Pankey ("the father"). In that regard, this Court must remain mindful of the limited scope of the initial review that attends the filing with this Court of a petition for a writ of certiorari directed to one of the courts of *964 appeal. Rule 39, Ala. R.App. P., prescribes the limitations in clear, mandatory terms. Rule 39(a)(1) dictates that "[i]n all civil cases ... petitions for writs of certiorari will be considered only" in five categories precisely delineated in Rule 39(a)(1) as being eligible for consideration for the issuance of the writ. Any contention sought to be presented that does not fit within one of those categories cannot be considered. In this case, the father has chosen to proceed solely pursuant to Rule 39(a)(1)(D). The language of that Rule is as follows:
"(a) Considerations Governing Certiorari Review; Grounds. Certiorari review is not a matter of right, but of judicial discretion. A petition for a writ of certiorari will be granted only when there are special and important reasons for the issuance of the writ.
"(1) Civil Cases .... In all civil cases... petitions for writs of certiorari will be considered only:
". . . .
"(D) From decisions in conflict with prior decisions of the Supreme Court of the United States, the Supreme Court of Alabama, the Alabama Court of Criminal Appeals, or the Alabama Court of Civil Appeals; provided that:
"1. When (a)(1)(D) is the basis of the petition, the petition must quote that part of the opinion of the court of appeals and that part of the prior decision the petitioner alleges are in conflict; or
"2. Where it is not feasible to quote that part of the opinion either because no wording in the opinion clearly shows the conflict or because no opinion was issued, the petition shall state specifically and with particularity how the decision conflicts with a prior decision."
The father's statement of his Rule 39(a)(1)(D) ground in his petition reads, in its entirety, as follows:
"The Father is seeking review of the decision of the Court of Civil Appeals based on Rule 39(a)(1)(D)2. of the Alabama Rules of Appellate Procedure in that the Court of Civil Appeals failed to review the trial court's decision in light of the factors set out by this Honorable Court in Ex parte Devine, 398 So.2d 686 (Ala.1981). Although the Father addressed each of these factors in the brief on appeal and the Court of Civil Appeals appeared to consider them in the August 24, 2001, opinion ..., it does not appear they were given any consideration in the March 15, 2002, opinion.... By failing to consider the trial court's decision in light of all of these factors, the March 15, 2002, decision of the Court of Civil Appeals is in conflict with the law as set out by this Honorable Court in Ex Parte Devine."

The father later reaffirmed in his petition the focus of his conflict ground by providing this condensed restatement of it as one of his "Issues Presented for Review":
"Did the Court of Civil Appeals err so as to create a conflict between its decision of March 15, 2002, and the law as set out by this Honorable Court in Ex parte Devine by affirming the trial court's custody decision while failing to consider that decision in light of all of the factors set out in Ex parte Devine rather than only the factor of adultery?"
Accordingly, and assuming without determining that this statement of "conflict" satisfies Rule 39(a)(1)(D)2., as specified by the father, our threshold function is to review the March 15, 2002, decision of the Court of Civil Appeals in conjunction with a careful reading of Ex parte Devine, to determine if a true conflict has been identified. *965 In that regard, we will consider all of the facts stated in the March 15, 2002, opinion of the Court of Civil Appeals. Further, the father having advised us that he "did not file an application for rehearing," we will consider any additional facts he provides in his petition in conformity with the requirements of Rule 39(d)(5)(C):
"[I]f the petition for writ of certiorari seeks review of a decision of the Court of Civil Appeals and the petitioner has not filed an application for rehearing with the Court of Civil Appeals, and ...
[i]f the Court of Civil Appeals issues an opinion containing a statement of facts and the party petitioning for the writ of certiorari is not satisfied with that statement of facts, the petitioner may, in the petition for the writ of certiorari, present to the Supreme Court a proposed additional or corrected statement of facts or the applicant's own statement of facts, with references to the pertinent portions of the clerk's record and the reporter's transcript."
The father has provided in his petition a three-page "Statement of Facts," which fully complies with that procedure and, thus, those facts (but only those facts) can be considered along with the facts contained in the March 15, 2002, opinion of the Court of Civil Appeals.
In note 6 in his dissent, the Chief Justice first states: "The sole issue before this Court in Ex parte Devine was the constitutionality of the `tender-years' presumption. That presumption required courts to award custody of young children, i.e., children of `tender years,' to the mother." 848 So.2d at 972. Then noting that the Devine court determined that presumption to be unconstitutional, the Chief Justice states, "Thus, the factors discussed in Ex parte Devine were not necessary for the decision and therefore are dicta." 848 So.2d at 972 n. 6. If that is an accurate assessment of the legal status of the factors noted in Ex parte Devine, then it is doubtful whether a failure by the Court of Civil Appeals to consider all of them would constitute a true conflict. As stated in Ivey v. Wiggins, 276 Ala. 106, 109, 159 So.2d 618, 620 (1964):
"`"It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision."'"
(Quoting State ex rel. Wilkinson v. Murphy, 237 Ala. 332, 341, 186 So. 487, 496 (1939), quoting in turn Osaka Shosen Kaisha Line v. United States, 300 U.S. 98, 103, 57 S.Ct. 356, 81 L.Ed. 532 (1937).)
Applying that principle, this Court concluded that certain statements made in one of its prior decisions, but that were not necessary to the disposition of that case, "are dicta and are not controlling here." 276 Ala. at 109, 159 So.2d at 620. See also State ex rel. Robertson v. Robertson, 675 So.2d 422, 425 (Ala.Civ.App.1995).
However, assuming, for the sake of further analysis, that the Devine factors have sufficient legal status that a decision of the Court of Civil Appeals "failing to consider [a] trial court's decision in light of all of these factors" could present a true conflict, the Devine factors warrant our attention in the analysis we must undertake in determining whether the writ of certiorari is due to issue. (That the Chief Justice considers those factors to have such status is evident by his statement that the "Court of Civil Appeals' misconstruction of the law it relies upon in affirming the trial court's custody award in this case conflicts directly with Ex parte Devine, which sets out this Court's current test for determining *966 initial custody." 848 So.2d at 979.) Although the Chief Justice's dissent lists six of the Devine factors, describing them as those "relevant for purposes of this case," 848 So.2d at 981, the court in Ex parte Devine concluded its catalog of those and certain other factors with the catchall provision, "and any other relevant matter the evidence may disclose." 398 So.2d at 697. In that regard, in addition to the facts mentioned in the Chief Justice's dissent, the opinion of the Court of Civil Appeals noted that the father "admits that the mother is a good mother," 848 So.2d at 962, and explained certain career-imposed limitations on the father's availability for daytime contact with the child:
"The father testified that he is training to be a pilot in the Army and that three days a week, he is at work from 5:30 a.m. to 5:00 p.m. On Tuesday and Thursday, he works from 7:30 a.m. to 5:00 p.m. He stated he lives near a day-care facility and that he plans to leave the child at the facility while he is at work. He stated that he had training exercises that lasted up to four weeks and that during those times, the child could stay with a member of the father's family, none of whom live in the immediate area. He testified that after a year in Enterprise, the next transfer he will receive will be for three years."
848 So.2d at 961. Furthermore, the Court of Civil Appeals noted that the child "is very close to his half-sibling," 848 So.2d at 962, who, according to the father's statement of facts, is "a girl named McKinley," and the court remarked that "the father stopped sending money to the mother for the child" the month after she filed for divorce. 848 So.2d at 961.
The Chief Justice's dissent states that "the father's argument on appeal" addressed each of the Devine factors. At the threshold stage of considering whether to grant or deny a petition for the writ of certiorari, this Court does not have before it the briefs submitted by the parties to the Court of Civil Appeals. Rather, we have only the brief the father has filed directly with this Court in support of his petition. The only facts we are allowed to consider at this stage are those contained in the opinion of the Court of Civil Appeals and in the father's statement of facts in his petition. Unfortunately, the Chief Justice, in his dissent, goes outside of the confines of those facts in several instances, to assert other, presently extraneous, facts in support of the arguments he makes, apparently having extracted those facts from the record on appeal before the Court of Civil Appeals. This strikes me as contrary to the essential concept of certiorari review.
The writ, when issued, commands the Court of Appeals to certify and send up the record of the proceeding before it. The writ has not yet issued; accordingly, this Court does not presently have custody of that record. It reposes, as it properly should, within the custody of the clerk of the Court of Civil Appeals. Only if we should issue the writ of certiorari to the Court of Civil Appeals in this case, in response to which it would certify and send up to us the record on appeal, would we properly have access to the full contents of that record. As it now stands, in connection with our analysis of the petition for the purposes of determining whether we should order the writ to issue, we are restricted to the facts contained in the opinion of the Court of Civil Appeals and to those additional facts the father has chosen to include in his petition. Therefore, at this stage we must eliminate from our consideration certain facts recited in the Chief Justice's dissent but which are nowhere contained, or even alluded to, in either the opinion below or the statement of facts presented by the father. For that *967 reason, I do not believe we can properly entertain the following factual assertions contained in the Chief Justice's dissent, which do not appear anywhere in the opinion of the Court of Civil Appeals or the petitioner's separately submitted statement of facts: That "while the mother and the child were living in Alabama, the mother left the child with the maternal grandmother while she traveled to New Orleans and Dothan on weekends with friends"; that "[t]he father attends church with the child, has not engaged in any extramarital activity, and has demonstrated exemplary conduct"; that "[t]he father's home environment appears impeccable, and he has supportive parents in Alabama who are willing to take care of the child when the father is on temporary military assignments"; that "[t]he father has no history of emotional or mental problems and has not had stress-related problems despite demanding military duties and transfers"; and that "[t]he mother has been able to hold only a series of part-time jobs since the birth of the child ...." 848 So.2d at 981-82.
As the Court of Civil Appeals correctly stated in its March 15, 2002, opinion, because the trial court made its custody determination following an ore tenus proceeding, "its judgment will not be reversed absent a showing that the judgment is so unsupported by the evidence as to be plainly and palpably wrong." 848 So.2d at 959 (supporting citations omitted). That is because, as the Court of Civil Appeals further acknowledged, with citations to supporting caselaw, "[t]he trial court is in the best position to determine custody, because it is able to evaluate the evidence and the credibility of the witnesses." 848 So.2d at 959-60. For that reason, again as noted by the Court of Civil Appeals, its review is limited and it "is not allowed to substitute its judgment for that of the trial court in cases involving child custody and visitation." 848 So.2d at 960. In this case, the trial judge awarded the parties "joint legal custody" of the child, with the mother to have "primary physical custody" of the child for 10 months out of the year and the father to have "primary custody of [the] child two (2) months during the summer (June and July)." Each party was to have reasonable visitation during the period he or she did not have primary physical custody.
After a consideration of all of the facts properly before us at this stage, can we say, as the father states in his petition, that the Court of Civil Appeals "failed to review the trial court's decision in light of the factors set out ... in Ex parte Devine..."? Given the restricted nature of our review at this juncture, I do not believe we can presume to draw that conclusion.
That is not to say that what has been laid before us is not troubling, at least as we are called upon to react to it at this time, without the benefit the trial judge had of being able to evaluate the evidence firsthand and assess the credibility of the witnesses.
The Chief Justice devotes much time discussing an entirely different issue, and one the father has not asserted. The Chief Justice criticizes the process whereby, under the Devine-factors approach
"the trial court weighs factors in a process that is akin to political decision-making. It is a difficult, if not impossible, balancing act that courts by nature are ill-equipped to perform. Simply wading through the factors listed in Ex parte Devine and weighing them to determine which parent should have custody, absent any definitive presumptions, produces inconsistent results. Different trial courts (and appellate courts) will assign different weights to various factors. Presumptions, on the other hand, *968 serve as benchmarks or rules of law that provide courts with more definitive standards for their rulings."
848 So.2d at 973. Although these arguments may well have merit, the father simply has not sought to raise them. That is to say, he has carefully and precisely focused his statement of the ground of conflict as being that the Court of Civil Appeals failed to review the trial court's decision in light of the factors set out in Ex parte Devine. He has in no way called into question the appropriateness, comprehensiveness, or adequacy of those factors. Consequently, I do not see how this Court, if it is to remain faithful to the carefully structured and circumscribed office and function of the petition for the writ of certiorari and its standard of review of such a petition, can give recognition to an internally volunteered "conflict" argument to justify the issuance of the writ.
These observations may seem, particularly to a lay reader, to represent a blind adherence to "technicalities," which thwarts reaching the merits of this case. Nonetheless, I consider it to be among my duties as a Justice of the Alabama Supreme Court to faithfully observe and follow those portions of the Alabama Rules of Appellate Procedure that are stated in explicit and mandatory terms, and to constrain my appellate review accordingly. Therefore, I have undertaken to write specially to that issue, because my view of the proper application of the definitively restrictive provisions of Rule 39 dissuades my going as far in my analysis as does the Chief Justice. That being said, I do not hesitate to acknowledge that much of what he has to say is worthy of thoughtful consideration in an appropriate case. This, however, is simply not that case.
MOORE, Chief Justice (dissenting).
I vigorously dissent from the denial of the petition for a writ of certiorari to the Court of Civil Appeals filed by Brian Pankey ("the father"). By refusing to review this case, this Court allows the continued erosion of historic precedent regarding the conclusive presumption of relative unfitness that applies to an adulterous parent in custody determinations. This Court may grant a petition for writ of certiorari when a decision of the Court of Civil Appeals is "in conflict with prior decisions of... the Supreme Court of Alabama." Rule 39(a)(1)(D), Ala.R.App.P. The father argues that the decision of the Court of Civil Appeals conflicts with this Court's opinion in Ex parte Devine, 398 So.2d 686 (Ala.1981). He presents a convincing argument for this Court to grant his petition.
However, the Court of Civil Appeals has done much more than simply issue an opinion that conflicts with one opinion by the Alabama Supreme Court. For years there has been a steady deterioration of this Court's standard regarding the fitness of an adulterous parent in a custody case. Prior decisions of this Court establish a conclusive presumption that a parent who has committed adultery is unfit to have custody of a minor child. This presumption is critical to a proper interpretation of Ex parte Devine. By imposing on the "nonadulterous" party a requirement to show a "detrimental effect" upon the child caused by the adultery, the opinion of the Court of Civil Appeals in this case directly conflicts with prior decisions of this Court. Furthermore, the trial court reached a custody conclusion entirely incongruous with Alabama law and with the evidence presented in the case. Moreover, in issuing its opinion, the Court of Civil Appeals also followed the irregular procedure of placing the case on rehearing ex mero motu, withdrawing its earlier opinion, and substituting another one. Pankey v. Pankey, 848 So.2d 958 (Ala.Civ.App.2002). It based its substituted opinion on a misrepresentation *969 of the father's argument, saying: "The father argues that the trial court erred in awarding primary physical custody to the mother, based on her adulterous conduct and the indiscretions." 848 So.2d at 962. This characterization of the father's arguments is incomplete; the father not only argued that he was improperly denied custody because of the mother's adulterous affairs, but he also successfully demonstrated his right to custody under each of the Devine factors.
The Court of Civil Appeals affirmed the circuit court's judgment in this divorce proceeding, awarding Mary Sue Pankey ("the mother") custody of the child, despite the fact that this Court has consistently held that, where the divorce judgement is awarded on the grounds of adultery, the conclusive presumption is that a parent who commits adultery is unfit to be awarded custody. Vinson v. Vinson, 263 Ala. 635, 640, 83 So.2d 215, 219-20 (Ala.1955). The father's brief states, with citations to the record, that the trial court granted this divorce in part because of the mother's adultery. However, "even though [a] mother has been guilty of adultery, such conduct does not, in and of itself, serve as an absolute bar to an award of custody to her.... On the other hand, there is a rule that such misconduct is an adjudication of her relative unfitness to have custody." Beasley v. Beasley, 276 Ala. 247, 249, 160 So.2d 863, 865 (Ala.1964) (second emphasis added). In other words, there is a conclusive presumption of unfitness upon proof of adultery as grounds for the divorce,[1] but that presumption of unfitness is "relative" and does not serve as an absolute bar to custody in an appropriate case.
There are at least two reasons for applying a presumption of unfitness in custody disputes to those guilty of adultery. The first is that such a presumption provides courts with a definite and predictable framework for making custody decisions. The second is that the presumption of unfitness gives effect to those moral and legal judgments reflected in statutes, in legal precedent, and in our common-law heritage.

I. Facts and Procedural History
The following facts are taken from the opinion of the Court of Civil Appeals and from the verified statement of facts in the petitioner's original brief to that court. The trial court entered a judgment divorcing Mary Sue Pankey and Brian Kevin Pankey on the grounds of adultery and an irretrievable breakdown of the marriage relationship; the divorce judgment awarded the parties joint legal custody of their minor child. The trial court awarded the mother primary physical custody for 10 months of the year; the father was to have physical custody for 2 months.
The Pankeys were married in Alabama in August 1995; they were age 24 and 18, respectively, when they married. The father had been on active duty with the United States Army before the marriage. *970 Within a month of their marriage, the couple moved to Evan Mills, New York, where their child was born in February 1996. After the birth of the child, the mother developed emotional and/or psychological problems. A doctor prescribed the antidepressant Prozac for the wife's postpartum depression. She later overdosed on acetaminophen, for which she received emergency medical treatment.
While the parties lived in New York, the mother left her child and the father to attend parties on five or six occasions and on those occasions remained away from the home until approximately 5:00 a.m. The mother testified that she used marijuana on occasions at those parties and that she used cocaine on one or two occasions during the marriage, without the father's knowledge.
After the couple had lived in New York for two years, the Army transferred the father to Korea. The mother and child did not accompany the father to Korea, but returned to Alabama to live with the maternal grandmother.[2] On more than one occasion while she was living in Alabama the mother left the child with the maternal grandmother for the weekend and went to New Orleans and to Dothan with friends.
In January 1999, while the father was stationed in Korea, the mother met Shannon Parris. She began openly cohabiting with Parris in March of that year. The mother testified that the child calls both the father and Shannon Parris "Daddy" and that the child has taken showers with Parris on more than one occasion, a practice to which the mother does not object. The mother and Parris also have had a child together.
The father moved back to the United States in May 1999. Before the father reported to his next duty stationKentuckythe child stayed with his father for three days. While stationed in Kentucky from June 1999 to March 2000, the father visited the child on all but eight weekends. The mother sued for a divorce on June 4, 1999. In July, after the mother had been living with Parris approximately five months, the father ceased sending the mother child support. In March 2000, the father was transferred to Fort Rucker, Alabama, and he has continued to see the child on every available weekend.
It is undisputed that the mother engaged in adultery on at least four occasions while her husband was stationed in Korea; that during the marriage and without the knowledge of her husband, she smoked marijuana at parties on as many as four occasions; and that she also used cocaine, which she had obtained from a friend.
The father appealed the trial court's judgment awarding the mother primary physical custody to the Alabama Court of Civil Appeals; the mother filed no brief in response to that appeal. On August 24, 2001, the Court of Civil Appeals reversed the trial court's custody award and awarded primary physical custody to the father because of the mother's adultery and the other factors listed in Ex parte Devine.
On September 6, 2001, the mother wrote a letter to the Court of Civil Appeals in which she attempted to justify her misconduct. Because she had not filed a brief in response to the father's appellant's brief on original submission and did not file an appropriate brief on rehearing, the mother was not entitled to a rehearing. Rule 40(a), Ala.R.App.P., states, in pertinent *971 part: "The party filing the application for rehearing must, when the application is filed, file a brief in support with the application.... No party can, as a matter of right, apply for a rehearing unless, on original submission, a brief was filed with the clerk [on original submission] as provided by the rules." (Emphasis added.)
Nevertheless, apparently in response to the mother's letter, the Court of Civil Appeals placed the case on rehearing ex mero motu and issued an opinion on March 15, 2002, seven months after its first opinion, withdrawing its original opinion, reversing its previous determination, and affirming the custody award to the mother. The mother's September 6, 2001, letter is attached as an appendix to this dissent. That letter was allegedly[3] submitted two weeks after the August 24, 2001, opinion of the Court of Civil Appeals and simply asks the Court to excuse her wrongdoing. In its March 15, 2002, opinion, the Court of Civil Appeals specifically referred to this letter as a "letter brief" sent to that court by the mother. The mother states in that letter:
"I admit that I went through a wild streak, but doesn't every 20 year old[?] My only mistake was that I didn't have the freedom other 20 year olds have....
"My husband knew that things were not going to continue in our relationship. I had given him every warning sign imaginable. I was just scared to say the words because I knew it would be a battle for our son....
"... I know that he [the son] is confused because he is a smart five year old that is well aware of some of the things that are going on right now....
". . . .
"... Yes, I did experiment with drugs, but that was it, I experimented. I don't think there are very many 19 year olds that haven't.... I do smoke cigarettes and I did at the time too. Although it was against my husband's wishes I did smoke cigarettes....
". . . .
"... Although I was separated from my husband the court seems to think that because I did have other relationships, three, I was having an extramarital affair. I do not see that as the case....
"... Yes, I did have a little bit of cocaine that someone had given me, but [the father's] best friend was the one that did it with me....
"... I have support from my current husband's[[4]] family as well."
(Emphasis added.) Such statements support a presumption that the mother is unfit to raise a child; they certainly do not rebut such a presumption. In another apparent attempt to "impress" the Court of Civil Appeals, the mother states in her letter: "I am Administrative Assistant to Tim Huddleston who is the Governor's *972 Advisor on Aerospace Affairs, and the director of the Aerospace Development Center." But such new evidence[5] is not before this Court, nor was it before the Court of Civil Appeals.
Appellate courts should reserve acting ex mero motu for extraordinary matters such as when a trial court lacks subject-matter jurisdiction to hear a case. The contents of the mother's letter do not justify placing the case on rehearing ex mero motu and awarding her custody. In fact, one of the main purposes of the rules of procedure is to prevent such inappropriate filings.
The Court of Civil Appeals also mischaracterized the father's argument on appeal. The Court of Civil Appeals stated in its opinion on rehearing that "[t]he father argues that the trial court erred in awarding primary physical custody to the mother, based on her adulterous conduct and the indiscretions." 848 So.2d at 962. However, the father did not argue that he was entitled to custody solely on the basis of the mother's adultery; rather, he contended that the majority of the Devine factors important for determining custody favored his gaining custody of the minor child. And he did so successfully, using the Devine factors.

II. The Presumption of Unfitness in the Event of Adulterous Conduct by a Parent in a Child-Custody Case
A trial court applies the "best-interests-of-the-child" standard in making an initial child-custody decision. This standard is extremely general in nature, and courts are called upon to give it more particular content in specific situations. In Ex parte Devine, supra, our Court attempted to clarify the standard by formulating a list of factors that trial courts could use in making custody decisions.[6] The holding in Ex parte Devine did not remove from the equation the conclusive presumption of unfitness of an adulterous parent, because that presumption has a direct bearing on the factors listed in Ex parte Devine, which include, among others, 1) the character of those seeking custody, and 2) the capacity of a parent to provide for the emotional, moral, social, and educational needs of the child. Moreover, a problem has developed with the way courts have applied the best-interests-of-the-child standard[7] in child-custody decisions.
*973 This case is illustrative of those problems. Rather than deciding custody matters by applying a firm rule of law, the trial court weighs factors in a process that is akin to political decision-making. It is a difficult, if not impossible, balancing act that courts by nature are ill-equipped to perform. Simply wading through the factors listed in Ex parte Devine and weighing them to determine which parent should have custody, absent any definitive presumptions, produces inconsistent results. Different trial courts (and appellate courts) will assign different weights to various factors. Presumptions, on the other hand, serve as benchmarks or rules of law that provide courts with more definitive standards for their rulings.
Presumptions in child-custody disputes keep courts focused on the tasks they must perform by concentrating on what has happened in the past rather than predicting what might happen in the future.[8] In the ordinary case, once a court makes the necessary factual determinations, the controversy is resolved by applying a rule of law that determines whether a legal wrong has been committed. The court then fashions an appropriate remedy. The injured party may be entitled to damages or to specific performance or reformation or to a divorce, depending on the type of wrong alleged and proved.
The presumption of unfitness of an adulterous parent is well established in Alabama law. In Beasley v. Beasley, 276 Ala. at 249, 160 So.2d at 865, this Court recognized "a rule that [adulterous] misconduct is an adjudication of [the adulterous parent's] relative unfitness to have custody." In Beasley, this Court also cautioned that, "even though [a parent] has been guilty of adultery, such conduct does not, in and of itself, serve as an absolute bar to an award of custody." 276 Ala. at 249, 160 So.2d at 865. Beasley did not destroy the conclusive presumption of unfitness; it simply allowed an adulterous parent to gain custody of a minor child upon a showing that the other party was more unfit than the adulterous party. See the following cases for a historic trail of the precedent: Vinson v. Vinson, supra; Hanby v. Hanby, 229 Ala. 527, 158 So. 727 (1935); and Johnson v. Johnson, 215 Ala. 487, 111 So. 207 (1927). Therefore, I must disagree with an attempt by the courts to apply a "standard" that is neutral as to morality and fault in determining who will be the custodial parent for the divorcing couple's children. It is unworkable in practice and nonjudicial in nature.
Contrary to the mistaken belief of some, the no-fault-divorce laws, which gained ascendancy about 30 years ago, did not effect a corresponding change in the rules for custody; therefore, with regard to custody, fault is still relevant. Even those commentators who support the concept of no-fault divorce recognize this fact. Lenore J. Weitzman, The Divorce Revolution: The Unexpected Social and Economic Consequences for Women and Children in America 223 (The Free Press 1985). Prior to no-fault divorce,[9] fault provided the *974 justification for divorce and typically settled the child-custody issue in favor of the party without fault. Today, the issue of fault is often treated as just one morally neutral factor among many in determining custody according to the best-interests-of-the-child standard.
Those acts and courses of conduct that historically provided grounds for fault-based divorce were "per se rules," that is, presumptions disqualifying the parent who was at fault in the divorce from gaining custody of any the children of the marriage for two possible reasons. One reason is that the actions establishing the fault would endanger the child. This would apply to such fault grounds as insanity, conviction of murder, or addiction to drugs. The other reason is that the actions establishing the fault strike at the heart of the marriage and consequently at the heart of the family. The archetypes of those grounds are adultery and desertion. One who commits an act so destructive to the family unit as to justify the spouse's seeking a divorce cannot normally be fit to head what remains of that family after the divorce. The party at fault has effectively divorced himself or herself from that family. Even though the Legislature has adopted no-fault divorce, Alabama law still provides certain grounds for divorce that also provide a rationale for child-custody determinations. The child's best interest is to remain with the parent who did not commit the acts that destroyed the family or that endanger the child.
In my concurring opinion in Ex parte H.H., 830 So.2d 21, 26 (Ala.2002), I wrote that there is a presumption that a parent who engages in open and notorious homosexual activity is unfit as a parent and should not be given custody of a minor child. That same presumption applies to acts of adultery, as Beasley v. Beasley makes clear. It is usually not in a child's best interest to be placed in the custody of a parent who has committed the adultery that has led to the destruction of a marriage and a family.
Recognizing the importance of presumptions in general and the Beasley rule in particular makes the custody determination in this case relatively simple. It is uncontested that the mother has committed several acts of adultery and presently lives in an adulterous situation, having had a child with the man with whom she cohabits. The trial court even stated that it granted the divorce in part on the grounds of adultery. The Beasley rule, relying upon Vinson and Johnson, supra, provides us with a conclusive presumption that the mother is unfit as a parent and that she should not have custody of the minor child. Nothing in the record indicates any unfitness on the part of the father. In fact, all of the evidence indicates that the father should have custody. In reaching this conclusion I am in no way ignoring the ore tenus presumption that favors the trial court's findings of fact. Rather, I find that the trial court misapplied the law to those facts and in doing so committed reversible error.
*975 In principle, there are good reasons expressed in both Alabama and United States Supreme Court precedent for considering adultery as a justification for divorce and for presuming that the adulterous parent is unfit to have custody of a minor child. First, we must understand that marriage is sacred.
"What shall we do with marriage, which is a contract, the most solemn and sacred of all, by its very terms indissoluble and eternal ...."
Sturges v. Crowninshield, 17 U.S. (4 Wheat.) 122, 163, 4 L.Ed. 529 (1819).
"The present age is wonderfully demoralized on the subject of marriage and divorce. It seems to be forgotten, that marriage is a divine institution, and, therefore, imposes upon parties higher moral and religious obligations than those imposed by any mere human institution or government."
Hughes v. Hughes, 44 Ala. 698, 703 (1870).
"`Marriage, while from its very nature a sacred obligation, is, nevertheless, in most civilized nations a civil contract, and usually regulated by law. Upon it society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal.'"
Davis v. Beason, 133 U.S. 333, 343-44, 10 S.Ct. 299, 33 L.Ed. 637 (1890) (quoting Reynolds v. United States, 98 U.S. 145, 165, 25 L.Ed. 244 (1878)).
"The institution of marriage, established by divine, and perpetuated and guarded by human, authority, constitutes the foundation of organized society, protects private and public morality and virtue, and moulds the character of the citizens of the commonwealth. While an agreement to marry is regarded generally as a civil contract, by its consummation contractual relations of a special kind are formed, and the status of the parties and their duties to each other and to the public, are ascertained and fixed. Extraordinary and exclusive personal relations are created to continue so long as both parties may live, and public interests are involved in the strict and complete observance of the marital vows and covenants. The marriage relation can not be rescinded or annulled by the mere volition of the contracting parties. Its preservation is deemed so essential to the public weal, that it can not be dissolved except by the sovereign power, or by a court of competent jurisdiction for causes prescribed by law on sufficient allegations and satisfactory proof."
Powell v. Powell, 80 Ala. 595, 597, 1 So. 549, 549-50 (1887).
"It will be conceded that marriage creates the most important relation in life, and has more to do with the morals and the civilization of a people than any other institution. It has been held to be the subject of control by Parliament in England, and by the state Legislatures in the United States. Such Legislatures have prescribed the reasonable conditions under which parties may contract marriage, the procedure, form, or acts, essential to consummate it, the duties and obligations assumed thereby, and its present and prospective effect upon the property rights of the contracting parties; and have specified the failures of duty which shall constitute grounds for the dissolution of the union.
". . . .
"The contractual relation or status of marriage is one of the most important and sacred, provided for and protected by the `social compact.'"
Barrington v. Barrington, 200 Ala. 315, 326-27, 76 So. 81, 92-93 (1917) (Thomas, J., concurring).
*976 Concomitant with the above, any act that destroys the sacred marriage contract carries serious consequences. Courts have presumed evidence of acts of adultery by one parent to be conclusive as to the question of that parent's unfitness to have custody.
"One of the pertinent inquiries in cases involving controversies between parties over the custody of children is which party was at fault in terminating the marital relation. Piner v. Piner, 255 Ala. 104, 50 So.2d 269 [(1951)]; Hammac v. Hammac, 246 Ala. 111, 19 So.2d 392 [(1944)].
"In the case at bar the decree of January 8, 1952, is conclusive as between the parties of Vinson's marital misconduct. Johnson v. Johnson, 215 Ala. 487, 111 So. 207 [(1927)]; Hanby v. Hanby, 229 Ala. 527, 158 So. 727 [(1935)]. And we said in the cases just cited that a decree granting a divorce to the husband on the ground of the wife's adulterous acts is conclusive of her relative unfitness to have the custody of the children."

Vinson, 263 Ala. at 640, 83 So.2d at 219-20 (emphasis on "relative" original; other emphasis added).
"An Adulterous Parent,whether father or mother, divorced for the proven offence, should only in the rarest circumstances be intrusted with the custody of a child. In the modern English practice, this rule is nearly or quite without exception. In an American court it was said, as to the wife, that `a woman who has been guilty of adultery is unfit to have the care and education of children, and more especially of female children.'"
2 J. Bishop, New Commentaries on Marriage, Divorce, and Separation § 1198 (T.H. Flood and Company 1891)(footnotes omitted).
Not only does adultery carry serious consequences under the civil law, but under Alabama law adultery remains a criminal offense:
"(a) A person commits adultery when he engages in sexual intercourse with another person who is not his spouse and lives in cohabitation with that person when he or that other person is married.
". . . .
"(c) Adultery is a Class B misdemeanor."
§ 13A-13-2, Ala.Code 1975. The Commentary to this Code section indicates that for the adultery to meet the elements of the offense, it must be "open and notorious," which is exactly what we have in this case.

III. The Practical Effect of the Court of Civil Appeals' Decision
The majority, in denying the petition for a writ of certiorari to the Court of Civil Appeals, leaves in place an erroneous precedent and effectively allows a trial court to presume that a parent's adultery does not harm the children of a marriage until a "detrimental effect" has been shown. This is so in spite of the fact that adultery is a crime under § 13A-13-2; that it is a ground for terminating a marriage under § 30-2-1(a)(2); that it destroys marriages and families; that it involves a violation of the most solemn of oaths; that it normally involves a pattern of deceit; and that it violates the established law of this State. In this case the wife committed many acts of adultery and brought a succession of men into the household, yet the Court of Civil Appeals found no detrimental effect on the child from such behavior.
The holding of the Court of Civil Appeals in this casethat adultery is not relevant to a custody determination until a *977 detrimental effect on the child is shown is contrary to the law in Alabama and does not reflect the judgment and experience of our legal heritage. Under the common law, adultery was treated as a serious crime, and the guilty party received "judgment of the pillory, tumbrel, or the like; or to be branded, whipt, or stigmatized; or... [was] outlawed or excommunicated," Beasley v. State, 39 Ala.App. 182, 186, 96 So.2d 693, 697 (1957) (quoting III W. Blackstone, Commentaries on the Laws of England 361, 362). Sir William Blackstone wrote:
"Divorce a mense et thoro is when the marriage is just and lawful ab initio, and therefore the law is tender of dissolving it, but for some supervenient cause, it becomes improper or impossible for the parties to live together: as in the case of intolerable ill temper or adultery, in either of the parties. For the canon law, which the common law follows in this case, deems so highly and with such reverence of the nuptial tie, that it will not allow it to be unloosed for any cause whatsoever, that arises after the union is made. And this is said to be built on the divine revealed law ...."
I W. Blackstone, Commentaries 428-29. The common law followed canon law, which allowed divorce under limited circumstances, one of which was adultery. Our law adopts the common law unless specifically repealed by statute. Section 1-3-1, Ala.Code 1975, states: "The common law of England, so far as it is not inconsistent with the Constitution, laws and institutions of this state, shall, together with such institutions and laws, be the rule of decisions, and shall continue in force, except as from time to time it may be altered or repealed by the Legislature." Furthermore, our Legislature has explicitly adopted adultery as a grounds for divorce. § 30-2-1(a)(2). To hold that adultery carries no presumption of unfitness in custody situations not only defies logic, but also defies the well-established law of Alabama as well.
Divorce based on the ground of adultery once served as a "conclusive adjudication" of relative unfitness to have custody. Johnson v. Johnson, 215 Ala. 487, 111 So. 207 (1927). While society's sensitivity to the staggering impact of adultery and divorce may have weakened considerably,[10] the Alabama Code requires us to take adultery into account when considering custody matters. Section 30-3-1, Ala. Code 1975, provides:
"Upon granting a divorce, the court may give the custody and education of the children of the marriage to either father or mother, as may seem right and proper, having regard to the moral character and prudence of the parents and the age and sex of the children; and pending the action, may make such orders in respect to the custody of the children as their safety and well-being may require."
(Emphasis added.) While this Court has made it clear that acts of adultery are not an absolute bar to custody, such misconduct is still a conclusive adjudication of that parent's relative unfitness to have custody. See Beasley, 276 Ala. at 249, 160 So.2d at 865. Should we now turn our backs on this plain legal rule and exchange it for a rule that relegates acts of adultery to the ash heap of legal irrelevance?
In this case, the Court of Civil Appeals disregarded this Court's precedent and instead relied upon one of its own prior decisions, Hearold v. Hearold, 620 So.2d 48 (Ala.Civ.App.1993), in which that court held that, when one of the parents has *978 engaged in adultery, a direct detrimental effect of that adultery upon the child must be demonstrated in order for adultery to be relevant to the custody determination.[11] This Court has never reviewed Hearold or Nesmith v. Nesmith, 419 So.2d 247 (Ala. Civ.App.1982), upon which the Court of Civil Appeals relied for support in Hearold. This Court has never burdened a parent before it with the duty to prove such a detrimental effect.
As support for this detrimental-effect requirement, the Court of Civil Appeals cited Hearold, which, in turn, cited Nesmith, supra, which, in turn, cited Gould v. Gould, 55 Ala.App. 379, 316 So.2d 210 (1975). The first case to use the detrimental-effect language was Monk v. Monk, 386 So.2d 753, 755 (Ala.Civ.App.1980), where the Court of Civil Appeals stated: "We noted [in Eskew v. Eskew, 57 Ala.App. 512, 329 So.2d 567 (1976)] that a parent should not, necessarily, be deprived of child custody for each act of indiscretion or immorality unless such behavior had a detrimental effect on the child." (Emphasis added.) Eskew had relied upon Gould for the proposition. 57 Ala.App. at 515, 329 So.2d at 570.
Thus, Gould appears to be the genesis of the detrimental-effect requirement relied upon by the Court of Civil Appeals in this case. In Gould, the Court of Civil Appeals did not use the words "detrimental effect" but in effect said the same thing, stating: "The moral unfitness of a mother to deprive her of custody must be such as to have a direct bearing upon the welfare of her child." 55 Ala.App. at 383, 316 So.2d at 214 (emphasis added).
Two points deserve notice regarding this supposed requirement that a party show that the parent's moral unfitness has a "direct bearing on the welfare of the child." First, the Court of Civil Appeals cited no Alabama cases as authority for the proposition; it could not do so because, as noted above, no Alabama Supreme Court cases have adopted or even mentioned this proposition. Second, Gould involved a request for a modification of custody, not an initial custody determination as in Pankey. This is significant because a modification of custody requires a high burden of proof to justify removing a child from the custody of one parent and placing him or her in the custody of the other.[12] For initial custody determinations, *979 however, "[t]he rule is, of course, that ... the paramount and controlling consideration is what is best for the interest and welfare of the child." Harrison v. Harrison, 279 Ala. 675, 677, 189 So.2d 471, 473 (1966). In an initial custody determination, each parent stands on equal footing, and the prevailing party should be the one who demonstrates that it is in the child's best interest that that party have custody. The innocent party need not prove that the other party's immoral conduct somehow has a detrimental effect upon the child. In proceedings dealing with initial custody determinations, such a rule turns the law completely on its head.
Proof of adultery plays a crucial role in determining the moral fitness of a parent. See Johnson v. Johnson, supra. See also Hanby v. Hanby, 229 Ala. 527, 158 So. 727 (1935); McGregor v. McGregor, 257 Ala. 232, 58 So.2d 457 (1952); and Vinson, supra. The Court of Civil Appeals' rule that in order to deny custody to the adulterous parent the adultery must be shown to have a direct bearing upon the welfare of the child not only creates a burden of proof that does not exist under Alabama law, but also places the parties on unequal footing by shifting the burden of showing a detrimental effect to the innocent party. The detrimental-effect rule forces the innocent parent to prove that the adultery has had a direct negative effect on the child, something that is difficult, if not impossible, to prove. The effects of adultery upon a childespecially the moral or emotional effectsare normally subtle and may not manifest themselves until many years after the divorce.
The Court of Civil Appeals has operated for years under a rule of its own creation that conflicts with the conclusive presumption established by this Court. The detrimental-effect rule propounded by the Court of Civil Appeals eliminates the conclusive presumption of relative unfitness and places a heavy burden of proof on the innocent parent. The Court of Civil Appeals' misconstruction of the law it relies upon in affirming the trial court's custody award in this case conflicts directly with Ex parte Devine, which sets out this Court's current test for determining initial custody. With the direct conflict this case presents to us, we should take the opportunity to correct the error of the Court of Civil Appeals, an error it has repeated and expanded in a multitude of cases since Gould. See, e.g., Mitchell v. Mitchell, 723 So.2d 1267 (Ala.Civ.App.1998); Murphree v. Murphree, 579 So.2d 634 (Ala.Civ.App. 1991); Jones v. Haraway, 537 So.2d 946 (Ala.Civ.App.1988); Smith v. Smith, 464 So.2d 97 (Ala.Civ.App.1985).
The Court of Civil Appeals has not only disregarded historic precedent, but it now concludes that the trial court may not find an adverse effect from the proven fact of adultery until a detrimental effect on the minor children has been "shown." This destroys the presumption of relative unfitness altogether, and, in effect, places a seemingly insurmountable burden on the innocent party to prove a detrimental effect in a case where the wife has committed numerous acts of adultery and in fact has brought the child with her into an adulterous relationship from which a second minor child has been born.
*980 Adultery can, and inherently does, have serious effects on both adults and children; it therefore must be taken seriously in custody cases: "The mother testified that the child calls both the father and her boyfriend `Daddy.'" Pankey, 848 So.2d at 961. This six-year-old child is obviously confused as to the identity of his father because the mother has been living with her boyfriend since the child was four, a year before the final divorce judgment was entered. The mother even admitted in her letter to the Court of Civil Appeals that the child is confused about the situation, yet she testified at trial that she is not concerned about the effect of her irresponsible behavior on the child. The mother obviously was not concerned about the effect her adulterous conduct would have on her marriage; it is no surprise that she is not concerned about its effect upon her child.
In Commander v. Commander, 493 So.2d 530 (Fla.Dist.Ct.App.1986), a Florida appellate court affirmed the trial court's denial of a mother's request for overnight visitation with her three children at the one-bedroom apartment she shared with her boyfriend. The Florida court stated:
"[T]he courts have not reached the level of impotency in protecting and preserving the institutions of marriage and the family that they are powerless to prevent impressionable young children from being thrust into the middle of a cohabitation living arrangement, such as in the case at bar, which would tend to foster the development of a distorted view by such children of acceptable norms of family life in our society....
"We have also considered the notion that the subject order may be vulnerable because there has been no evidence that the visitation demanded by the appellant has adversely affected the children.... [W]e do not believe a court must wait until there is a demonstrable adverse effect upon a child.... Rather, we believe that a reasonably anticipated adverse effect on the child from exposure to a proposed situation or circumstance may be sufficient to support an order prohibiting such situation or circumstance."
493 So.2d at 532-33. Judge Ingram, then serving on the Alabama Court of Civil Appeals, expressed agreement with this view: "I agree with the views expressed in... Commander. ... If a court must wait until the harm to an impressionable child caused by parental misconduct becomes demonstrable, then it is too late for the court to fulfill its obligation to act in the best interests of the child." Jones v. Haraway, 537 So.2d 946, 952 (1988) (Ingram, J., dissenting) (emphasis added).
Justice Ingram and the Florida appellate court express what should be common sense and what was previously recognized in Alabama law: where adultery exists, detrimental effects to a child should be assumed.
"To apply the truism to a mother whose life is not blameless, but is dominated by the carnal desires of the flesh, can it be doubted that her principles, example, and influence, if allowed the child's custody, would not be reflected in the life and character of the child?"
Hanby v. Hanby, 229 Ala. 527, 528, 158 So. 727, 728 (1935).
In stark contrast to the law expressed in Hanby, Johnson, Vinson and Beasley v. Beasley, the Court of Civil Appeals has, under the facts of this case, declared that adultery could never be proven to have a detrimental effect on a minor child so that an adulterous parent could never be presumed to be unfit. By denying certiorari, this Court fails to correct this error.

*981 IV. The Proper Application of the Devine Factors

I disagree with using only a factor-driven analysis in custody determinations, especially in a case such as this one where the finding of fault in the divorce can easily decide who should be awarded custody. Nevertheless, even an analysis under Ex parte Devine demonstrates the error of the trial court, when under such a factor-driven analysis the father should have been awarded custody.
The Devine factors, relevant for purposes of this case, include the following: (1) the child's "emotional, social, moral, material, and educational needs; [ (2) ] the respective home environments offered by the parties; [ (3) ] the characteristics of those seeking custody, including age, character, stability, mental and physical health; [(4) ] the capacity and interest of each parent to provide for the emotional, social, moral, material and educational needs of the [child]; [ (5) ] the interpersonal relationship between [the] child and each parent;... [and (6) ] the effect on the child of disrupting or continuing an existing custodial status." 398 So.2d at 696-97. The father's argument on appeal addressed each of these factors. The Court of Civil Appeals virtually ignored the Devine factors, even though the trial court failed to make any specific findings of fact on the custody issue in the divorce judgment.
At least four of the Devine factors favor the father: the child's needs; the respective home environments; the capacity of each parent to provide for those needs; and the displayed character of each parent. Financially, the father makes a great deal more money than the mother and has a stable full-time job in the Army and therefore is better equipped to meet the child's material and perhaps educational needs. The mother has been able to hold only a series of part-time jobs since the birth of the child, and she has another child to provide for as well. The father has demonstrated that he will make the time commitments necessary to provide stability for a young child. While stationed in Kentucky for about a year, the father made the eight-hour trip to Alabama to spend weekends with his son all but eight weekends. Since he was transferred to Alabama, the father has spent every available weekend with his son. In contrast, while the mother and the child were living in Alabama, the mother left the child with the maternal grandmother while she traveled to New Orleans and Dothan on weekends with friends. When the family lived in New York, the mother regularly went out with friends, leaving the child and the father at home, not telling the father where she was going, and not returning on some occasions until 5:00 in the morning. The father's commitment to his son should not be surprising, considering that he has been committed to his marriage, even seeking reconciliation with his wife after learning of her adulterous conduct.
The home environments of the father and the mother contrast sharply as well. The father attends church with the child, has not engaged in any extramarital activity, and has demonstrated exemplary conduct, according to the facts before us.[13]
*982 The mother, on the other hand, has not only admitted to having had four extramarital affairs, but she has also admitted to smoking marijuana and experimenting with cocaine. The mother also admitted to using profanity regularly around the house. The father's home environment appears impeccable, and he has supportive parents in Alabama who are willing to take care of the child when the father is on temporary military assignments.
The mental and emotional states of the parents also favor giving custody to the father. The father has no history of emotional or mental problems and has not had stress-related problems despite demanding military duties and transfers. The mother, however, was diagnosed with postpartum depression after the birth of the child, and once required emergency care for overdosing on acetaminophen apparently because of depression, for which she was prescribed medication. While the father was stationed in Korea, the mother complained of stress related to taking care of the child and was prescribed medication for the stress.
In short, all of the relevant Devine factors weigh in favor of awarding custody of the child to the father. In light of the overwhelming evidence, it is difficult to see how the trial court or the Court of Civil Appeals could have concluded that the mother should be awarded primary custody, even using Devine's factor-driven analysis.

V. Conclusion
The mother's adultery alone in this case should have been sufficient cause to award custody of the child to the father, who has no indication of unfitness whatsoever. Nevertheless, the Court of Civil Appeals, under the facts of this case, concluded that the mother's adultery had had no detrimental effect on the child and ignored the procedural requirements for an application for rehearing in order to affirm the award of custody to the mother. Its conclusion was mistaken, and this Court exacerbates that mistake in forgoing the opportunity to correct that error. The moral and legal condemnation of adultery in our society is historic. When lower courts embrace adultery as an insignificant act without moral consequence they may be embracing a current cultural trend, but by so doing they are disregarding the law their judges are sworn to uphold. All legislation declares what is right and what is wrong, and our Legislature has specifically determined adultery to be wrong. Certainly the Court of Civil Appeals cannot choose to ignore that standard, which our Legislature has specifically adopted and which has long been recognized by the courts of this State. To destroy the conclusive presumption of relative unfitness to custody of a minor child that has historically attached to a parent who has committed adultery is to disregard a moral foundation of our law. It is incumbent upon this Court to correct that error. By denying certiorari review, it fails to do so. Therefore, I dissent.

APPENDIX TO CHIEF JUSTICE MOORE'S DISSENT
September 6, 2001
Court of Civil Appeals
300 Dexter Avenue
Montgomery, AL
Dear Sir of Madam:
I would like to start this letter by voicing my opinion, which is that I believe a child should be with his mother, just as long the *983 mother is capable, willing, and able to take care of that child. I believe that I am quite capable and more than willing to care for my child. I have a five-year old son that has been with me since the day he was born. My son now has a little sister that he loves and takes care of.
In 1988 my husband, at the time, Brian Pankey, got orders to be stationed in Korea. I went home to stay with my mom and start school. I was 19 years old at the time, with a 2-year old son. Before my husband left we had been having problems and I had on more than one occasion told him that I wanted a divorce. But because of my immaturity and instability, I decided I would put off the divorce until he was back in the states. I was also scared of becoming a single mother, having to depend on my mother for support. I was trying to go to school at Jacksonville State University, but factors caused me to withdrawal.
During the time my husband was in Korea I as had just turned 20 years old. I admit that I went through a wild streak, but doesn't every 20 year old. My only mistake was that I didn't have the freedom other 20 year olds have. I partied and experimented with things that I am embarrassed about and regret now. I regret the mistakes I made during the year my husband was gone and would take them back in an instant, but I can't. All I can do is try to make up for those mistakes and make the best of myself, for my family.
My husband knew that things were not going to continue in our relationship. I had given him every warning sign imaginable. I was just scared to say the words because I knew it would be a battle for our son. He had admitted to me before that if something ever happened to us that we would never be friends. He learned that from his mother who constantly talked bad about their father, and ultimately turned two of three children against him. I admit that the way I went about letting him know about the actual divorce papers were wrong, but I didn't know what else to do. I was tired of being controlled and manipulated by him. I knew if it were just the two of us talking about the divorce he would some how manipulate the situation. I wanted to eliminate the chance of that happening. I had someone serve him the papers.
In January of 1999, I met someone and we began a relationship. As far as I was concerned, my husband and I were separated and well on our way to a divorce. I started talking to a lawyer in February of March of the same year, but the process was lengthy because of monetary complications. The person I met is a wonderful "father-figure" to my son and an absolute perfect father, period to our daughter. I know that my son will always have his real father and now a stepfather. He knows that Shannon is his friend and loves him, his mommy and sister and will always be there for him. The most important thing, though, is that he knows that Brian is his one and only true father. We know that and we make sure that he is aware of that. BJ, our son, loves his father and is never discouraged from doing so. I know that he is confused because he is a smart five year old that is well aware of some of the things that are going on right now. I try my best not to talk about it in front of him and I definitely never talk about his dad in a negative way in front of our son. I encourage the relationship that my son and his father have.
*984 I received the Appeal from the Alabama Court of Civil Appeals on September 5, 2001. The date the appeal was dated was August 24, 2001. I have two days from the day I received the appeal to make my own appeal, which I plan on doing. I would like to begin with stating that all of the statements made in the brief were not true or exaggerated to the limits of almost being false.
This is my "side" of the story.
Brian and I had dated for three years. We met when I was 15 years old and he was 21. He was in college and he liked to party and have fun. As a matter of fact, he bought alcohol for some friends of mine and myself for our proms, and on a couple of other occasions for myself. My mother did not agree with the relationship from the very beginning because he has lied to her about his age. Another reason we were not allowed to date was because a friend of his killed himself in the living room of the house where Brian lived because they were playing Russian roulette. Another reason that should have told me that my mother was right all along was because Brian got arrested on July 24, 1993 at Talladega for Public Drunkenness. I don't believe he has ever told any one about that.
We never really had time to spend together, but we talked on the phone a lot and once he enlisted we wrote letters. He was gone to South Carolina and then New York a year and a half before we were married. I had tried to break things off during the time he was away, but I changed my mind. He promised to take me away from my overbearing and extremely strict mother. What 17 year old wouldn't take someone up on that opportunity? We were married 5 days after I turned 18 years old. Just legal. I was 3 months pregnant and scared to death of what my mom would do if she found out. I didn't let her know, but I told her that Brian and I were getting married and she kicked me out of the house a week before my birthday. We were married and drove all the way up to Evans Mill, NY in a car jam packed with luggage and other items, three months pregnant. We did stop in Gatlinburg, and at his cousin's in Virginia, but that was pretty much the extent of our "honeymoon." We ate at Arby's for our dinner the night we were married.
The brief that my ex-husband filed says "I had developed emotional or psychological problems after the birth of the child." I believe that would be properly defined as post pardon depression, which I was diagnosed with. However, just the fact that I had just had a baby was not the reason for my depression. We moved to New York in September, Brian left for a little over a month in October. I was in an apartment, by myself. I didn't have any friends or neighbors. I didn't have anyone to talk to because I didn't know anyone. I didn't know how to get anywhere but to the mall and Wal-Mart. I was absolutely miserable. And still at that time my mother and I were not on good terms, so that problem was constantly on my mind. I missed my mom, sister, and my home in Alabama.
After being diagnosed with post pardon depression I was prescribed Prozac, which I took for a little while. It helped me get through things a little easier. The second time I was prescribed Prozac was because Brian was home from Korea, we were discussing the separation/divorce and he decided that I was losing it and that I needed to take Prozac again. I didn't think I needed it, but he drove me to the clinic and made me go in. I was crying *985 and pleading with him to not make me go in there. He seems to be the only person that thinks that I need to be on Prozac. I haven't taken it in 4 years and I am doing perfectly fine and leading a normal and productive life.
We had lived in New York for almost two years before I met a friend that I felt was a true friend. We hung out a lot. There were a group of three of us and we were always at each other's apartments or on the phone with each other. At this time was the best I felt while I lived in New York because I had finally found some one to talk to and hang out with. When my son was 18 months old or even older I decided that I did want to go out on occasions with these friends of mine. My husband and I had already been having problems, just because of the fact that I was 19 and I was anxious to do something, I just didn't know what. Being cooped up I an apartment for two years, with nothing to do but watch TV can get very old. The only thing I had that saved me was my son BJ. I spent every hour with him until he went to bed. When I started going out I would make sure BJ was fed and in bed before I went anywhere. I didn't tell my husband where I was going because we really weren't sure. We would always decide while we were driving. Yes, I did experiment with drugs, but that was it, I experimented. I don't think there are very many 19 year old that haven't. I do smoke cigarettes and I did at the time too. Although it was against my husband's wishes I did smoke cigarettes.
I told my husband that I wanted a divorce several times before he left for Korea. I had changed and so had he. He was not the same person I had met when I was 15 and I definitely was not the same person. I had changed and I was not in love with him anymore. He knew that and he knew I wanted a divorce. When I left to stay with my mother in Alabama in January of 1998 he knew that I wanted a divorce, so I thought that constituted a separation. We did communicate while he was away and the thought even crossed my mind to work things out, but things were so different and I knew for sure that I was not in love with him anymore.
When I moved to Alabama to stay with my mother I enrolled at Jacksonville State University and I did good the first couple of semesters. Then I started to slack on my studies. I wasn't ready to go to school. I think at the time I wanted to experience the life I had missed because I had married at such an early age. I did visit friends in Dothan, but I took my son on almost every occasion. The friend I visited in Dothan was one of the friends I had met in New York and we had become very close friends. For her birthday we decided to go to New Orleans for Mardi Gras and I did leave my son with my mom for two days then. I do not believe, however, that I have ever neglected my child or put him in any kind of harm.
I did start to see people once I came back to Alabama. I had met a male friend in New York previously, but it was just plutonic. Although I was separated from my husband the court seems to think that because I did have other relationships, three, I was having an extramarital affair. I do not see that as the case. Maybe I'm wrong, but I stand on my position of the matter. If I could take back those relationships now, I believe I would just because of the fact that its one of the leading decision makers in this case. I made a mistake. I'm making up for those mistakes *986 and proud of how far I've come and what I have accomplished.
The incident at Bristol is not entirely true. Yes, I did have a little bit of cocaine that someone had given me, but Brian's best friend was the one that did it with me. Brian was at the convenient store at the time buying beer for me, because I was a minor. This same friend, who is supposed to be his best friend since childhood called me during Fourth of July the year Brian was in Korea wanting me to meet him at a party in Guntersville. I told him no. I knew there would be drugs and who knows what else there. This friend's sister has been in and out of rehab for "crank," and I know at the time she was a pretty hot and heavy dealer. I also know that Brian's so called friend got hooked on "crystal" for a while.
I know I have made my fair share of mistakes and I regret and apologize for making those mistakes and hurting those people I hurt. I am 24 years old now. My mother and I have the best relationship now than we have ever had. I have support from my mother now, which was something that I didn't have before. I have support from my current husband's family as well. I recently graduated from Gadsden Business College in Administrative Specialist. I was on the dean's list each quarter and I maintained a 3.9 or 4.0 average. I'm not sure about that. I now have a full time job working for the Aerospace Development Center, which is located on the campus of Jacksonville State University. I am the Administrative Assistant to Tim Huddleston who is the Governor's Advisor on Aerospace Affairs, and the director of the Aerospace Development Center. I have held this job since June 5, 2001, two weeks after I graduated.
My daughter, who is 17 months, is in day care at Jacksonville Day Care Center. She is taken care of very well as at home. She is a very bright and active child. My son has just started Kindergarten at Ohatchee School. He is doing very well. I spoke with his teacher, Mrs. Beecham, just the other day and she said he is one of her brightest students. He knows his phone number address and he knows how to spell his complete name. He knows how to spell certain words and he can recognize other words. He is also in extended day school program because my husband and I both work until 5:00. He works on activities that they work on during the day at the extended day program. We always pick him up on time. BJ is in bed by 9:00pm, he is always clean and groomed for school. We make sure that he gets on the bus safely each morning and that he has everything he needs for school. BJ is used to this routine and I think a child, especially a school-age child should be in a routine.
I think that because of the mistakes I have made in the past I shouldn't be punished by having my son taken from me. I believe that I have made up for the mistakes I have made in every way that I could. I am living a stable, normal, and happy family life. I believe I deserve another chance.
Sincerely,
/s/ Mary Parris
Mary Parris
Administrative Assistant to Tim Huddleston
BROWN, Justice (dissenting).
I respectfully dissent from the denial of certiorari review in this case. I would grant the petition in order to fully examine the record to determine whether the trial court abused its discretion in awarding *987 primary physical custody of the child to the mother.
NOTES
[1] In his special writing, Justice Harwood criticizes my dissent for discussing points outside the direct conflict with Ex parte Devine raised by the father in his petition. However, my writing is a dissent to the denial of the petition for writ of certiorari; it is not a majority opinion. The direct conflict with Ex parte Devine gives this Court sufficient justification to grant the petition; however, that specific conflict does not prevent my discussing in a dissenting opinion other issues in this area of law that I believe need correction. As I explain in this opinion, the courts have failed to apply this Court's stated presumption of unfitness to custody cases in which one spouse has committed adultery. That is the more fundamental error, and I would be remiss if I merely addressed a symptom of the disease and not its source.
[2] Neither party testified as to the reason the mother and the child did not go to Korea with the father.
[3] We have no verification that the mother actually submitted the letter within the requisite 14 days after the issuance of the August 24, 2001, opinion by the Court of Civil Appeals, another problem caused by the mother's failure to follow the Alabama Rules of Appellate Procedure.
[4] Even though the father argues only the custody determination issue on appeal, the opinion of the Court of Civil Appeals states that the father "appeals from a judgment divorcing him" from the mother. Because this appeal is still pending, the mother is not yet divorced. Her reference to her present husband indicates two possibilities: Either she has remarried while she is still married to the father, an act of bigamy, or she simply thinks of herself as unmarried from the father and able to treat Parris as her common-law husband. Neither the remarriage nor the common-law marriage would be legitimate.
[5] In addition to the fact that the mother failed to file the appropriate briefs with the Court of Civil Appeals, her "letter brief" did not comply with the Rules of Appellate Procedureit did not contain a statement of facts or make any reference to the record of trial. Rules 32(a) and 40(g), Ala.R.App.P. In fact, this "letter brief" was no more than an improper ex parte communication by one party in the case to the judges on the Court of Civil Appeals. It is an appellate court's responsibility to ignore any information in such a communication, or perhaps even to sanction the party engaging in such conduct. In re Emmet, 293 Ala. 143, 300 So.2d 435 (1974).
[6] The sole issue before this Court in Ex parte Devine was the constitutionality of the "tender-years" presumption. That presumption required courts to award custody of young children, i.e., children of "tender years," to the mother. This Court determined in Ex parte Devine that that presumption, a holdover from the nineteenth century, was unconstitutional. Thus, the factors discussed in Ex parte Devine were not necessary for the decision and therefore are dicta.
[7] The best-interests-of-the-child standard is not a new idea under Alabama law. As early as 1858, this Court held:

"The welfare of the offspring is the controlling consideration, in applications such as this....
"... [O]rders of this kind are made for the benefits of the child ...."
Cornelius v. Cornelius, 31 Ala. 479, 481 (1858).
[8] The trend of applying the Devine factors in a "morally neutral" fashion followed closely upon the heels of the liberalization of divorce commonly known as "no-fault" divorce. The grounds for a fault-based divorce were, and can be, proven in a court of law by the admission of evidence and use of the same procedure applied generally in courts of law. If fault was proven, the court did not simply consider this as one factor among many as to whether it is in the couple's best interest or society's best interest to grant the divorce. In contrast, without proof of fault, a court is placed in the difficult position of deciding whether the parties would be better off divorced.
[9] Prior to 1861, only the Alabama Legislature could grant total divorces. Initially, the only grounds for a divorce were adultery and desertion by either party, although wives were also afforded divorce on the ground of cruelty. During the nineteenth and twentieth centuries, grounds for divorce were expanded to include incapacity, crimes against nature with man or beast, alcohol and drug addiction, and certain felony convictions. Not until 1971 did Alabama adopt the no-fault principles of "incompatibility of temperament" and "irretrievable breakdown of the marriage." § 30-2-1(a)(7) and (9), Ala.Code 1975; Penny Davis & Robert L. McCurley, Jr., Alabama Divorce, Alimony, and Child Custody Hornbook, 45 (3d ed.1993). Unlike some states that adopted "no-fault" grounds for divorce, Alabama did not eliminate its fault grounds. The Legislature simply added the no-fault grounds of incompatibility and "irretrievable breakdown" in addition to the fault grounds.
[10] See Weitzman, 24.
[11] The Court of Civil Appeals stated:

"To be sufficient to deprive a parent of custody, acts of indiscretion or adultery must be such as to have a direct bearing upon the welfare of the child. Hearold v. Hearold, 620 So.2d 48 (Ala.Civ.App.1993). There is no evidence in the record of a detrimental effect on the child."
Pankey, 848 So.2d at 962.
In Hearold the Court of Civil Appeals observed: "The record reflects that the acts the father contends the mother committed, which should deprive her of custody, did not occur in the presence of the children and did not affect their welfare." 620 So.2d at 48 (emphasis added). Therefore, to show that the adultery of the mother had a detrimental effect, the father in Hearold had to show that she committed the adultery "in the presence of the children." The Hearold court changed the standard from the adulterer's being presumed unfit to a standard requiring a showing of a detrimental effect on the child, which could not be shown unless the adultery was committed "in the presence of the children."
[12] This higher burden in custody-modification cases was established in Ex parte McLendon, 455 So.2d 863 (Ala.1984). The Court of Civil Appeals has summarized that burden as follows:

"[C]ustody will be changed only if the parent seeking the modification proves that there has been a material change in circumstances since the prior judgment, that the child's best interest will be materially promoted by a change of custody, and that the benefits of the change will more than offset the inherently disruptive effect caused by the change in custody. Ex parte McLendon, 455 So.2d at 866. `The evidence must be so substantial as to show an obvious and overwhelming necessity for a change.' Vick v. Vick, 688 So.2d 852, 855 (Ala.Civ.App. 1997)."
B.S.L. v. S.E., 826 So.2d 890, (Ala.Civ.App. 2002).
[13] I find it odd to be criticized for using facts contained in an opinion issued by the Court of Civil Appeals. I admit that I use several facts that were included in that court's original opinion, which was withdrawn by that court on rehearing ex mero motu, but at one time that writing was a public record. I also find it odd to be criticized for not following a procedural nicety when the Court of Civil Appeals so cavalierly ignored procedure in several ways. Technically, the mother's letter to that court was never a proper filing either, but that did not stop the Court of Civil Appeals from using it as the occasion to reverse itself on this case and continue distorting the law relating to child custody. That the facts I use all favor the father simply lends further credence to my contention that this Court should grant the petition for the writ of certiorari.